1 | MELINDA HAAG (CABN 132612)
United States Attorney

2

3 | DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

4 | BRIAN C. LEWIS (DCBN 476851)
WADE M. RHYNE (CABN 216799)
5 | Assistant United States Attorneys
1301 Clay Street, Suite 340S
6 | Oakland, California 94612
Telephone: (510) 637-3680
7 | Facsimile: (510) 637-3724
Email: brian.lewis@usdoj.gov
8 | wade.rhyne@usdoj.gov

9 | Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| UNITED STATES OF AMERICA, | ) | NO. CR-12-00862 YGR |
|---|---|---|
| Plaintiff, | ) | **UNITED STATES' TRIAL MEMORANDUM** |
| v. | ) | Trial Date: June 8, 2015 |
|  | ) | Time: 8:30 a.m. |
| BRIAN FEDERICO AND KEVIN LANEY, | ) |  |
|  | ) | Pretrial Date: May 15, 2015 |
| Defendants. | ) | Time: 2:00 p.m. |

UNITED STATES' TRIAL MEM.
No. CR-12-00862 YGR                                i

**TABLE OF CONTENTS**

I.   CASE SCHEDULING AND CUSTODY STATUS ................................................................. 1
II.  THE INDICTMENT ................................................................. 1
III. SUMMARY OF ANTICIPATED EVIDENCE AT TRIAL ......................................................... 2
     A.   The Scheme to Defraud ......................................................... 2
     B.   Matrix Discovers the Fraud ......................................................... 4
     C.   Laney's Confession ......................................................... 4
     D.   Federico's Admissions ......................................................... 6
     E.   Cooperating Witnesses ......................................................... 7
IV.  DEFENDANTS' CRIMINAL HISTORIES ......................................................... 7
V.   EVIDENTIARY ISSUES FOR TRIAL ......................................................... 7
     A.   Statements by a Defendant ......................................................... 7
     B.   Expert Witness Testimony ......................................................... 8
     C.   Co-conspirator Statements ......................................................... 8
     D.   Summaries of Voluminous Evidence by Summary Witness ......................................................... 10
     E.   Impeachment of Testifying Defendant ......................................................... 11
     F.   Business Records and Public Records ......................................................... 12
     G.   Limitations on the Defendant's Use of Character Evidence ......................................................... 13
     H.   Presence of the Case Agent During Trial ......................................................... 13
     I.   Stipulations ......................................................... 144
     J.   Rule 404(b) Evidence ......................................................... 14
VI.  CONCLUSION ......................................................... 15

**CASES**

*Bourjaily v. United States*, 483 U.S. 171 (1987) ................................................................. 8, 9

*Cockrell v. Oberhauser*, 413 F.2d 256 (9th Cir. 1969) ............................................................. 1

*Johnson v. Tennis*, 549 F.3d 296 (3rd Cir. 2008) ..................................................................... 1

*United States v. Anekwu*, 695 F.3d 967 (9th Cir. 2012) ........................................................ 12

*United States v. Bellucci*, 995 F.2d 157 (9th Cir. 1993) ........................................................ 13

*United States v. Beverly*, 913 F.2d 337 (7th Cir. 1990) ......................................................... 13

*United States v. Black*, 767 F.2d 1334 (9th Cir. 1985) .......................................................... 11

*United States v. Bowman*, 215 F.3d 951 (9th Cir. 2000) ........................................................ 8

*United States v. Chea*, 231 F.3d 531 (9th Cir. 2000) ............................................................ 14

*United States v. Collicott*, 92 F.3d 973 (9th Cir. 1996) .......................................................... 8

*United States v. Crespo de Llano*, 830 F.2d at 1543 ............................................................ 10

*United States v. Cuozzo*, 962 F.2d 945 (9th Cir. 1992) ........................................................ 11

*United States v. Diaz*, 961 F.2d 1417 (9th Cir. 1992) ........................................................... 13

*United States v. DiCesare*, 765 F.2d 890 ............................................................................... 9

*United States v. Fernandez*, 839 F.2d 639 (9th Cir. 1988) ..................................................... 7

*United States v. Foster*, 711 F. 2d 871 (9th Cir. 1983) ......................................................... 10

*United States v. Fox*, 189 F.3d 1115 (9th Cir. 1999) .............................................................. 9

*United States v. Gay*, 967 F.2d 322 (9th Cir. 1992) .............................................................. 12

*United States v. Huffhines*, 967 F.2d 314 (9th Cir. 1992) .................................................... 12

*United States v. Johnson*, 297 F.3d 845 (9th Cir. 2002) ....................................................... 12

*United States v. Layton*, 720 F. 2d 548 (9th Cir. 1983) ........................................................ 10

*United States v. Lewis*, 594 F.3d 1270 (10th Cir. 2010) ....................................................... 12

*United States v. Liera*, 585 F.3d 1237 (9th Cir. 2009) ....................................................... 8, 9

*United States v. Loya*, 807 F. 2d 1483 (9th Cir. 1987) ........................................................... 9

*United States v. Lukashov*, 694 F.3d 1107 (9th Cir. 2012) ............................................. 13, 14

*United States v. Marchini*, 797 F.2d 759 (9th Cir. 1986) ..................................................... 11

*United States v. Mason*, 658 F. 2d 1263 (9th Cir. 1981) ........................................................ 9

1. *United States v. Ogles*, 406 F.3d 586 (9th Cir. 2005) .................................................................. 14
2. *United States v. Orellana-Blanco*, 294 F.3d 1143 (9th Cir. 2002) ............................................... 12
3. *United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000) .............................................................. 7, 8
4. *United States v. Portac, Inc.*, 869 F. 2d 1288 (9th Cir. 1989) ...................................................... 10
5. *United States v. Rizk*, 660 F.3d 1125 (9th Cir. 2011) ................................................................... 11
6. *United States v. Rrapi*, 175 F.3d 742 (9th Cir. 1999) ................................................................... 14
7. *United States v. Savedra*, 684 F.2d 1293 (9th Cir. 1982) .............................................................. 9
8. *United States v. Silverman*, 861 F.2d 571 (9th Cir. 1988) ........................................................ 9, 10
9. *United States v. Stinson*, 647 F.3d 1196 (9th 2011) .................................................................... 10
10. *United States v. Torres*, 908 F.2d 1417 (9th Cir. 1990) ............................................................. 10
11. *United States v. Yarborough*, 852 F.2d 1522 (9th Cir. 1993) .................................................... 10
12. *United States v. Zavala-Sierra*, 853 F.2d 1512, 1516 (9th Cir. 1988) ....................................... 10

**STATUTES**

18 U.S.C. § 1341 ................................................................................................................................. 1
18 U.S.C. § 1349 ................................................................................................................................. 1
California Health & Safety Code § 11350(a) ..................................................................................... 7
California Health & Safety Code § 11352 .......................................................................................... 7

**RULES**

Fed. R. Evid 902(4),(11) ................................................................................................................... 12
Fed. R. Evid. 1006 ............................................................................................................................. 11
Fed. R. Evid. 404(a)(1) ...................................................................................................................... 13
Fed. R. Evid. 404(b) ........................................................................................................................... 14
Fed. R. Evid. 405(a) ........................................................................................................................... 13
Fed. R. Evid. 608(a) ........................................................................................................................... 13
Fed. R. Evid. 801(d)(2)(A) .................................................................................................................. 7
Fed. R. Evid. 801(d)(2)(E) .................................................................................................................. 8
Fed. R. Evid. 803(6) ........................................................................................................................... 12
Fed. R. Crim. P. 16(a)(1)(G) ............................................................................................................... 8

| | | |
|---|---|---|
| 1 | Fed. R. Evid.702 ............................................................................................................................ | 8 |
| 2 | Fed. R. Evid. 703 ........................................................................................................................... | 8 |
| 3 | Fed. R. Evid. 705 ........................................................................................................................... | 8 |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys Brian C. Lewis and Wade M. Rhyne, hereby submits its trial memorandum setting forth the relevant procedural history, the anticipated evidence and legal basis for the charges, and a summary of law on anticipated evidentiary issues that may arise at trial.

## I. CASE SCHEDULING AND CUSTODY STATUS

Defendants Kevin Laney and Brian Federico were released on bonds on December 21, 2012 and have remained out of custody pending trial arising from the same Indictment. Trial is set to begin on June 8, 2015. Both defendants have waived their right to a jury trial and have requested a joint bench trial.[1] Dkt. 127. The estimated time for the United States' case-in-chief is approximately six trial days with roughly 15-20 witnesses, due to the parties' evidentiary stipulations which obviate the appearance of multiple business and public record custodians.

## II. THE INDICTMENT

On December 6, 2012, the Grand Jury returned a six-count Indictment, including a forfeiture allegation, against Laney, Federico, and three other defendants—Miguel Ibarria, Brandon Hourmouzus, and Charles Burnette. The Indictment charged all defendants with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349 (Count 1); and certain individual defendants with mail fraud, in violation of 18 U.S.C. § 1341 (Counts 2-6). Specifically, as to Counts 2-6, the Grand Jury charged the defendants with mail fraud as follows:

| COUNT | CHARGED DEFENDANTS |
|-------|--------------------|
| 2 | Ibarria, Federico & Laney |
| 3 | Ibarria, Federico & Hourmouzus |

---

[1] Laney and Federico were previously set for separate trials based on an anticipated Bruton issue. However, the Bruton issue that warranted severance of the defendants' trial before a jury was cured now that the parties are proceeding with a single bench trial. *See Cockrell v. Oberhauser*, 413 F.2d 256, 257-58 (9th Cir. 1969) ("The Bruton rule does not apply to [defendant] because she was tried by the court and not by a jury. Nothing in Bruton suggests that a judge is incapable of applying the law of limited admissibility which he has himself announced."); *see also Johnson v. Tennis*, 549 F.3d 296 (3rd Cir. 2008) ("We hold that the Bruton rule is inapplicable to the incriminating confession of a non-testifying codefendant in a joint bench trial. By its own terms, Bruton applies to jury trial only. In so deciding we agree with every United States Court of Appeals that has considered the question.").

UNITED STATES' TRIAL MEM.
No. CR-12-00862 YGR            1

| 4 | Ibarria & Federico |
|---|---|
| 5 | Ibarria & Federico |
| 6 | Ibarria & Burnette |

Defendants Ibarria, Hourmouzus, and Burnette have already pleaded guilty to conspiracy to commit mail fraud (See Dkt. Nos. 44, 58, & 60.) Accordingly, the remaining counts against Laney are Counts 1 and 2, and for Federico they are Counts 1 through 5.

**III. SUMMARY OF ANTICIPATED EVIDENCE AT TRIAL**

**A. The Scheme to Defraud**

The charged scheme was a conspiracy to defraud Matrix Service Company ("Matrix") carried out by three of Matrix's own employees and two individuals who worked for one of Matrix's subcontractors, Imperial Shotcrete ("Imperial"). More specifically, the conspiracy involved three Matrix project managers (Laney, Hourmouzus, and Burnette) and two individuals with Imperial (Federico and Ibarria), who together conspired to defraud Matrix in connection with various oil refinery tank construction and maintenance jobs.

Matrix is an industrial contractor headquartered in Tulsa, Oklahoma that provides engineering, fabrication, construction, repair, and maintenance services to energy and industrial clients, including major oil refineries in California. Imperial is a smaller concrete sub-contracting company located in Livermore, California. Matrix regularly hired Imperial as an approved vendor to perform concrete work on Matrix's projects, often the repair tank bottoms that were used to store petroleum products.

Each Matrix project was managed by a designated project manager whose duties included ensuring successful completion of the project by awarding subcontractor bids, reviewing subcontractor invoices, and approving payments to subcontractors—such as Imperial. Knowing that Matrix project manager coconspirators (Laney, Hourmouzus, or Burnette) would review and approve, or have influence in the review and approval of, Imperial's initial concrete bids and subsequent concrete invoices, Federico and Ibarria would submit false and inflated bids and invoices to Matrix. In many instances, the project managers told Federico and Ibarria how much "to pad" Imperial's bids while remaining within Matrix's project budget. In doing so, Federico and Ibarria were able to maximize ill-gotten gains, to pay

UNITED STATES' TRIAL MEM.
No. CR-12-00862 YGR           2

1  kickbacks to the Matrix project managers, and to avoid higher-level scrutiny at Matrix.

2  After Matrix paid Imperial based on these inflated invoices, there were two levels of downstream
3  kickbacks to distribute the ill-gotten gains among the coconspirators. At the first level, Imperial would
4  kickback payments to a bogus nominee company created by a Matrix project manager—often the very
5  project manager who directly approved Imperial's bid on that project. To that end, Laney created a
6  nominee company called "Rogue Consultants;" Hourmouzus created a nominee company called
7  "Hourmouzus & Sons;" and Burnette created a nominee company called "BER Consultants." Each
8  project manager received kickbacks, usually in the form of checks written to those nominee companies.
9  In order to give these first-level kickbacks the appearance of legitimacy, the Matrix project manager's
10 nominee company would submit invoices to Imperial covering the amount of the kickbacks. But, these
11 invoices were bogus and were for work that was not completed or products that were never produced.
12 Nevertheless, these bogus invoices allowed Imperial to pay the Matrix project managers kickbacks and
13 "to balance" its books. After the Matrix project managers got their cut, there was a second-level of
14 kickbacks in which Federico would often get the lion's share of the remaining ill-gotten gains. In order
15 to give these second-level kickbacks the appearance of legitimacy, Federico would issue bogus invoices
16 using nominee companies—such as "CEMS" and "APL"—to the Matrix project managers' nominee
17 companies, which would in turn make payments to the Federico-created nominee companies. The
18 financial records show the flow of the payouts from Matrix, to Imperial, to project manager nominee
19 companies, and then to Federico's nominee companies. (See U.S. Trial Exhibit No. 71) (Demonstrative
20 exhibit showing the conspirators' submission of invoices and flow of money.)

21 Bank records and additional government investigation show that Ibarria never received the
22 second-level kickbacks that Federico received. Ibarria will testify that he agreed to defraud Matrix on
23 various jobs at the request of Federico and the project managers, but that he did so to ensure that the
24 project managers hired Imperial for future concrete projects.

25 In summary, Imperial – through Federico and Ibarria – was the hub of the conspiracy, submitting
26 padded bids and bogus invoices to Matrix which were essentially preapproved by coconspirator Matrix
27 project managers. When Matrix paid Imperial, the money was funneled down through Imperial, to the
28 project managers, and then to Federico. The evidence will show that although Ibarria did not receive

UNITED STATES' TRIAL MEM.
No. CR-12-00862 YGR                3

sizeable kick-backs he nevertheless benefitted when the Matrix project managers continued to hire Imperial for additional work.

### B. Matrix Discovers the Fraud

Because the scheme involved Matrix project managers "on the inside," the defendants were able to carry out their scheme for over three years on multiple projects without detection. However, in August 2010, Matrix discovered the fraud after an internal audit conducted by Stinnett & Associates and Akin Gump LLP. The audit confirmed the chain of fraudulent invoices and subsequent payments from Matrix, to Imperial, and then through project manager-created nominee companies. Matrix referred the case to the FBI.

### C. Laney's Confession

In September 2011, FBI agents met with Laney for two interviews during which Laney confessed to much of the scheme. The United States intends to offer these statements against Laney at trial. In relevant part, Laney admitted to working as a Matrix project manager, and to informing Federico about Matrix projects that would be susceptible to padded billing by Imperial. Laney explained that his discussions about Imperial submitting padded invoices were with Federico, not Ibarria. Laney told agents that Federico did "all the talking" for Imperial.

In describing the scheme, Laney admitted to forming Rogue Consultants ("Rogue"), to opening a Rogue bank account at Federico's request, to submitting bogus Rogue invoices to Imperial on the same Matrix jobs that Laney managed, and to sharing the proceeds with Federico.

In sharing the proceeds, Laney stated that Federico proposed that Rogue pay Federico in the form of checks made payable to a company set up by Federico, called "CEMS." (Financial records confirm that Rogue checks were deposited into Federico's CEMS bank account.) Laney told agents that Federico assured him that the plan would make money and that it was "legal."

Laney further admitted that he gave Federico notice of Matrix projects that were easier "to pad" with over-billings. Laney told agents that larger jobs with 10-12 workers, with longer time-tables, and with higher budgets were more susceptible to added expenses without detection. Laney said that Federico would give him constant assurances that they would not "get caught."

When agents asked about Rogue's invoices Laney admitted that he created the invoices on his

computer, and that he used billing descriptions suggested by Federico. Although Laney initially contended that some of his Rogue invoices were legitimate, he ultimately admitted that most, if not all, of his Rogue invoices were fraudulent. In discussing his motive, Laney told agents that he was "a little strapped for cash."

Laney also authenticated multiple checks representing the two-levels of kickbacks. As to the first-level kickbacks, when shown copies of 15 checks totaling over $1 million from Imperial to Rogue, Laney admitted that the payments represented the "padded" or false invoices that Laney had submitted to Imperial on his own Matrix jobs. Laney recalled that although his billing discussions had always been with Federico, the checks were handed to him in an envelope by Ibarria.

As to the second-level kickbacks, when shown copies of 8 checks totaling $598,441.34 from Rogue to CEMS, Laney admitted that these payments represented Federico's share of the proceeds. Laney told the agents that Federico was "always on top of it," usually asking for his payout immediately after Ibarria handed checks to Laney. (Bank records show that Federico's kickbacks were usually in the form of checks written to his bank's name, rather than to Federico. Bank records also show that the checks were deposited into Federico's account.)

Laney told the agents that he used the Rogue money to build a workshop and an office on a Montana ranch he had recently purchased, and to purchase a John Deere ATV, two trailers, and a new life insurance policy. Laney's bank records confirm that shortly after committing the fraud he spent nearly $400,000 at a fabrication company, a tractor company, a trailer company, and a life insurance company, among other expenditures. Subsequent photos of Laney's Montana ranch depict a large fabricated barn-style structure, and a large trailer.

Upon reflection, Laney admitted to the agents that he knew what they had done was wrong. Laney further admitted to agents that he has used other subcontractors to similarly defraud Matrix on other projects. More specifically, Laney told agents about approaching another subcontractor, California Sandblasting & Coating ("CSC"), with a plan to overbill Matrix in a similar manner.[2] In that

---

[2] The United States has provided notice under Federal Rule of Evidence 404(b) that it intends to offer Laney's admissions about CSC as evidence of his motive, intent, knowledge, and modus operandi as to the charged scheme.

UNITED STATES' TRIAL MEM.
No. CR-12-00862 YGR                              5

scheme, Laney and CSC together overbilled Matrix with approximately 5 invoices for a total of $200,000 for work that was never completed. Laney used another nominee company called "Western State Consulting," along with Rogue, to receive the CSC kickbacks.[3]

### D. Federico's Admissions

In October 2014, Federico also made incriminating admissions to the FBI. However, Federico gave agents a slightly different version of the scheme. Federico said the scheme was designed to obtain money from Imperial and Ibarria, and not necessarily from Matrix. Federico claimed that Imperial and Ibarria owed him money and that Federico devised this scheme simply to recoup money owed to him. As such, Federico stated that he created bogus invoices by co-opting another company's logo – APL. Federico then submitted the APL invoices to Imperial, but insisted that the invoices represented work that Federico had actually completed, while doing business as "CEMS," on behalf of Imperial. In essence, Federico maintained that he was committing fraud, not against Matrix, but against Ibarria and Imperial in order to settle a business dispute.

Agents next asked Federico about the bogus Rogue invoices submitted by Laney to Imperial. Federico admitted that he asked Laney to submit them to Imperial on Federico's behalf in order to get Federico's share of monies owed to him by Ibarria and Imperial. Federico continued to insist that the bogus Rogue invoices billed for work that was actually completed by Federico's company, CEMS, and therefore Matrix had not been cheated. Federico incriminated Laney stating that Laney demanded a cut of the payout before Laney made the payments to Federico through CEMS.

Agents next asked Federico about his relationship with Matrix project manager Hourmouzous and Hourmouzus's nominee company, Hourmouzous & Sons. Federico told agents a similar story, namely that Hourmouzus had agreed to submit the invoices to Imperial for work that was completed by CEMS in order to assist Federico in obtaining monies owed to him by Ibarria and Imperial. Federico authenticated multiple Hourmouzous & Sons payouts.

Federico failed to explain how Matrix, as the general contractor, was not harmed by his

---

[3] In October 2012, Laney recanted many of the statements he gave the FBI in his previous interviews, stating that he "must have misunderstood the agents' questions." Telephone records show that Laney had been communicating with a telephone number associated with Federico before he had changed his version of events.

1 agreements with Laney and Hourmouzous.  Federico made no mention of having Matrix project
2 managers identify projects susceptible to inflated invoices.
3   Financial analysis confirmed that Federico was in debt at the time he committed the fraud
4 scheme.  Federico was then making payments on two home equity lines of credit (HELOC) loans—one
5 in his name and one in the name of his mother-in-law.

**E.  Cooperating Witnesses**

The United States anticipates calling Ibarria and Hourmouzous as cooperating witnesses.  Both witnesses will testify that the scheme was designed to defraud Matrix, with the assistance of Matrix project managers, using padded invoices from Imperial.

Other witnesses will testify that Laney appeared to live beyond his financial means by spending money on gold investments, home improvements, a classic car, a hermetically sealed garage, and ranch implements.

**IV.  DEFENDANTS' CRIMINAL HISTORIES**

Laney has no known prior convictions.  Federico has multiple prior felony convictions: (1) in 1989 for possession of narcotics, in violation of California Health & Safety Code § 11350(a), for which he was sentenced to 365 days of jail and 60 months of probation (Ventura, Court Case No. CR23670); and (2) in 1988 for possession and transportation of narcotics in violation of California Health & Safety Code §§ 11350(a) and 11352, for which he was sentenced to 120 days of jail and 36 months of probation (Los Angeles, Court Case No. A712263).

**V.  EVIDENTIARY ISSUES FOR TRIAL**

**A.  Statements by a Defendant**

Prior statements made by a defendant are non-hearsay when offered by a party opponent – in this case, by the government.  Fed. R. Evid. 801(d)(2)(A).  A defendant, however, may not elicit his own prior statements; they are inadmissible hearsay.  *Id.*; *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000).  To hold otherwise would allow a defendant "to place his exculpatory statements 'before the jury without subjecting [himself] to cross-examination, precisely what the hearsay rule forbids.'" *Ortega*, 203 F.3d at 682 (quoting *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988)).  This is true even if the government has offered other portions of the defendant's statement, and the defendant

UNITED STATES' TRIAL MEM.
No. CR-12-00862 YGR           7

purports to offer additional portions for context under the rule of completeness, Federal Rule of Evidence 106. The rule of completeness, which applies only to written and recorded statements, does not transform inadmissible hearsay into admissible evidence. *See id*. at 682-83; *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) (holding that "Rule 106 'does not compel admission of otherwise inadmissible hearsay evidence'"). In this case, Laney and Federico have provided non-hearsay statements to law enforcement that will be offered by the United States.

### B.  Expert Witness Testimony

The government expects to call the following expert witnesses in its case-in-chief: (1) Mark Funck, former Senior Manager, CPA and Certified Internal Auditor (CIA) at Stinnette & Associates LLC; (2) Justin Pino, Senior Project Manager from Matrix; and (3) William Leoni, special agent from the FBI. The United States has previously disclosed a detailed expert designation and notice outlining the witnesses' expected testimony, their qualifications, and bases for their opinions, all pursuant to Federal Rules of Evidence 702, 703, and/or 705, and Federal Rule of Criminal Procedure 16(a)(1)(G).

### C.  Co-conspirator Statements

The United States intends to offer co-conspirator statements that were made during, and in furtherance of, the conspiracy by persons with knowledge of the conspiracy. These co-conspirator statements include statements made between and among co-conspirators Laney, Federico, Ibarria, Hourmouzus, Burnette, and others, regarding the submission of bids, the approval of bids, the review and approval of invoices, and the payment of invoices, among other relevant topics.

A statement is not hearsay if "the statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E); *see also*, *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). The statement of a co-conspirator is admissible if the court finds by a preponderance of the evidence that: (1) a conspiracy existed at the time the statement was made, (2) the defendant knowingly participated in the conspiracy, and (3) the statement was made during the course of and in furtherance of the conspiracy. *See United States v. Liera*, 585 F.3d 1237, 1245-1246 (9th Cir. 2009); *United States v. Bowman*, 215 F.3d 951, 960-61 (9th Cir. 2000). The government cannot establish knowing participation "rely[ing] solely on the alleged co-conspirator statements themselves," *Liera*, 585 F.3d at 1246, but need present only slight

evidence connecting the defendant to the conspiracy, *United States v. Mason*, 658 F. 2d 1263, 1269 (9th Cir. 1981). The requirements of Rule 801(d)(2)(E) and the Confrontation Clause of the Sixth Amendment are identical. *Bourjaily*, 483 U.S. at 182-84.

So long as a defendant eventually joins a conspiracy, the admission of a co-conspirator's statement cannot be defeated by an objection that the statement at issue was made prior to the defendant joining the conspiracy. *See United States v. DiCesare*, 765 F.2d 890, 900 (9th Cir.), *amended on other grounds*, 777 F.2d 543 (1985) ("'[A] conspirator who joins a pre-existing conspiracy is bound by all that has gone on before in the conspiracy."); *United States v. Savedra*, 684 F.2d 1293, 1301 (9th Cir. 1982). Further, once a defendant joins a conspiracy, his continued membership in the conspiracy is presumed absent an affirmative showing of withdrawal. *United States v. Fox*, 189 F.3d 1115, 1118 (9th Cir. 1999) ("A conspirator can withdraw from a conspiracy by (1) disavowing the unlawful goal of the conspiracy; (2) affirmatively acting to defeat the purpose of the conspiracy; or (3) taking definitive, decisive, and positive steps to disassociate himself from the conspiracy.").

In determining whether the requirements of the co-conspirator rule have been met, the Court can rely on any relevant evidence, whether admissible or not. *Bourjaily*, 483 U.S. at 175 ("[T]he judge should be empowered to hear any relevant evidence, such as affidavits or other reliable hearsay."). Such evidence may include, for example, hearsay evidence, evidence not admitted in the trial, and the co-conspirator statements themselves. *Id*. at 178-79 ("Out-of-court statements made by anyone, including putative co-conspirators, are often hearsay. Even if they are, they may be considered . . . ."). A trial court has discretion to vary the order of proof in admitting a co-conspirator's statement; the statement may be admitted prior to the presentation of independent evidence of the conspiracy. *United States v. Loya*, 807 F. 2d 1483, 1490 (9th Cir. 1987).

Evidence short of proof of the commission of the substantive offense is sufficient to prove the defendant's knowing participation in the conspiracy by a preponderance of the evidence. *United States v. Silverman*, 861 F.2d 571, 579 (9th Cir. 1988). In determining whether a conspiracy exists, the court may consider the co-conspirator's statements themselves, but those statements alone do not conclusively establish the existence of the conspiracy. *United States v. Torres*, 908 F.2d 1417, 1425 (9th Cir. 1990). To determine whether evidence supports the existence of a conspiracy, the court considers facts such as

UNITED STATES' TRIAL MEM.
No. CR-12-00862 YGR                9

the nature of the scheme, the identity of the participants, the quality, frequency and duration of each conspirator's transactions, and the commonality of time and goals. *Id*. Once some additional proof of the existence of the conspiracy has been offered, the Court must determine whether such proof, viewed in light of the co-conspirator statement itself, demonstrates by a preponderance that the defendant knew of and participated in the conspiracy. *Silverman*, 861 F.2d at 579.

Moreover, a conspiracy need not be charged to introduce a co-conspirator's statements. *United States v. Portac, Inc.*, 869 F. 2d 1288, 1294 (9th Cir. 1989). Participation as an aider and abettor suffices, as a concert of action creates a conspiracy for purposes of the evidentiary rule. *Id*.

In determining whether a statement was made "in furtherance of" a conspiracy, the focus is not on its actual effect in advancing the goals of the conspiracy but rather on the declarant's intent in making the statement. *United States v. Zavala-Sierra*, 853 F.2d 1512, 1516 (9th Cir. 1988). Accordingly,

> [w]hen a declarant seek[s] to induce [the listener] to deal with the conspirators or in any other way to cooperate or assist in achieving the conspirators' common objective, the declaration may be admissible [as a co-conspirator statement]. Statements concerning activities of the conspiracy, including future plans, also may become admissible when made with such intent.

*United States v. Foster*, 711 F. 2d 871, 880 (9th Cir. 1983). A statement is "in furtherance" of a conspiracy if it furthers the common objectives of the conspiracy or sets in motion transactions that are an integral part of the conspiracy. *United States v. Layton*, 720 F. 2d 548, 556-57 (9th Cir. 1983). Statements made to induce enlistment or further participation in the group's activities are considered to be in furtherance of the conspiracy, as are statements to prompt further action, to allay fears or reassure members of a conspiracy's continued existence, and to keep co-conspirators abreast of an ongoing conspiracy's activities. *See United States v. Yarborough*, 852 F.2d 1522, 1535-36 (9th Cir. 1993); *Crespo de Llano*, 830 F.2d at 1543. Acts of concealment charged as part of the scope of a conspiracy are in furtherance of the conspiracy. *See United States v. Stinson*, 647 F.3d 1196, 1215-16 (9th 2011).

**D.     Summaries of Voluminous Evidence by Summary Witness**

The United States currently intends to offer the following summary exhibits in its case-in-chief: (1) a summary spreadsheet of bank account holders and signature authorities; (2) a graphical diagram of invoices and payments showing the flow of money among the coconspirators' bank accounts with date

and exhibit number references; (3) a summary spreadsheet of invoices and payments; and (4) a summary of telephone calling logs.

Federal Rule of Evidence 1006 allows voluminous writings, recordings, or photographs, "which cannot conveniently be examined in court," to be presented in the form of a chart, summary, or calculation. Fed. R. Evid. 1006. "The purpose of the rule is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011) (citations omitted). It is essential that the underlying records from which the summaries are made be admissible in evidence, and available to the opposing party for inspection, but the underlying evidence does not itself have to be admitted in evidence and presented to the jury. *See id.*; *see also, United States v. Marchini*, 797 F.2d 759, 765-66 (9th Cir. 1986) (affirming admission of summary exhibit prepared by case agent, where underlying evidence was adduced at trial and agent was subject to cross-examination).

Here, the summaries consist of graphical diagrams and summary spreadsheets, all of which were created by the case agent or by the forensic accountant, Mark Funck, each of whom will be subject to cross examination. In creating these summaries, the witnesses used voluminous records, which have been previously produced to the defendants and will be separately admitted as exhibits at trial. The evidentiary summaries will also be produced prior to trial. The summary exhibits will save the Court from engaging in a timely line-by-line analysis of the underlying bank account records and invoices for each of the relevant transactions, although these records will be available their review, if necessary.

### E.  Impeachment of Testifying Defendant

A defendant who testifies at trial waives her right against self-incrimination and subjects himself to cross-examination concerning all matters reasonably related to the subject matter of her testimony. The scope of the defendant's waiver is co-extensive with the scope of relevant cross-examination. *United States v. Cuozzo*, 962 F.2d 945, 948 (9th Cir. 1992); *United States v. Black*, 767 F.2d 1334, 1341 (9th Cir. 1985) ("What the defendant actually discusses on direct does not determine the extent of permissible cross-examination or his waiver. Rather, the inquiry is whether the government's questions are reasonably related to the subjects covered by the defendant's testimony.") (internal quotation marks omitted). Federal Rule of Evidence 404(b) "does not proscribe the use of other act evidence as an

impeachment tool during cross-examination." *United States v. Gay*, 967 F.2d 322, 328 (9th Cir. 1992). Accordingly, prior bad acts of the defendant may be the subject of proper impeachment if (1) defendant testifies and (2) the underlying conduct is reasonably related to the subjects covered on direct examination. As described below, the United States has disclosed all prior bad acts evidence that is currently in its possession.

### F. Business Records and Public Records

The United States intends to offer certain certified records as business records and public records without live testimony, pursuant to the Federal Rules of Evidence and stipulations by the parties. In this case, the certified business records are from Wells Fargo Bank, Bank of America, U.S. Bank, Travis Credit Union, First Security Bank, JP Morgan Chase, Bank One, Verizon Wireless, Sprint, and AT&T; and the certified public records are from the Secretaries of State for California and Montana and the California Department of Motor Vehicles, all offered pursuant to Fed. R. Evid. 803(6) & (8).

Properly certified business records are self-authenticating and admissible when supported by sworn declarations from qualified records custodians. *See* Fed. R. Evid. 803(6) and 902(11); *see also United States v. Anekwu*, 695 F.3d 967, 976 (9th Cir. 2012); *United States v. Johnson*, 297 F.3d 845 (9th Cir. 2002) (bank records and sales orders were properly admitted as business records under Rule 803(6)); *United States v. Lewis*, 594 F.3d 1270, 1278-79 (10th Cir. 2010) (affirming admission of boxes of bank records under Rule 902(11) because defendant had 39 days from the government's notice of its intention to introduce such evidence to inspect them).

Certified public records that are certified correct by a custodian or that bear an official seal of the public entity are also self-authenticating and admissible without live testimony. *See* Fed. R. Evid 902(4) and 803(8); *see* also, *United States v. Orellana-Blanco*, 294 F.3d 1143, 1150 (9th Cir. 2002) ("[Rule 803(8)] developed to admit . . . public documents for which no serious controversy ordinarily arises about their truth and it would be a great waste of time to have the person who created them come to court and testify, such as birth certificates, death certificates, judgments, licenses, and the like."); *United States v. Huffhines*, 967 F.2d 314, 320 (9th Cir. 1992) (copies of judgments certified by proper custodian of records were admissible under Rule 902(4)); *United States v. Bellucci*, 995 F.2d 157, 161 (9th Cir. 1993) ("Because the certificate of insurance is not hearsay, no special showing is required under the

Confrontation Clause before it may be admitted in place of testimony by a representative from the FDIC.").

### G. Limitations on the Defendant's Use of Character Evidence

The defendants may elect to call character witnesses to testify on their behalf. However, evidence of a person's character is not admissible for the purpose of proving a person's actions on a particular occasion except "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same." Fed. R. Evid. 404(a)(1). Rule 405 limits the admission of character evidence to reputation or opinion testimony, but allows inquiry into "relevant specific instances of conduct" on cross examination.

Pertinent traits to which a character witness may testify include the very general trait of being law-abiding and other narrow case-specific traits. *United States v. Diaz*, 961 F.2d 1417, 1419 (9th Cir. 1992). Character witnesses may not testify about specific good acts or specific good deeds performed by the defendant (*e.g.*, that the defendant gives to charity or is a successful business person). Fed. R. Evid. 405(a), 608(a). Nor may a character witness testify about a defendant's lack of a criminal record or the absence of bad habits or acts (e.g., that the defendant has never been arrested or does not smoke). *Id.*; *United States v. Beverly*, 913 F.2d 337, 353 (7th Cir. 1990). A defense witness can offer an opinion of the defendant's truthfulness only if the defendant has already taken the stand and the government has already attacked the defendant's credibility. Fed. R. Evid. 608(a); *United States v. Lukashov*, 694 F.3d 1107, 1117 (9th Cir. 2012).

### H. Presence of the Case Agent During Trial

The United States requests the Court to allow FBI case agent William Leoni present at counsel table during the trial. Under Federal Rule of Evidence 615(3), "a person whose presence is shown by a party to be essential to the presentation of the party's cause" should not be ordered excluded from the court during trial. The case agent's knowledge of the evidence and facts of the case makes him essential to United States' presentation of its case. As such, his presence at trial is necessary to the United States.

//
//
//

UNITED STATES' TRIAL MEM.
No. CR-12-00862 YGR                13

### I. Stipulations

The Court has accepted the parties' stipulation to pre-admit as exhibits the government's business records, bank records, and public records. The parties also stipulate that the checks listed in Counts Two through Five of the Indictment were deposited, sent, and delivered by the United States Postal Service and interstate carriers. The parties will continue to meet and confer regarding additional stipulations to further streamline the trial.

### J. Rule 404(b) Evidence

The United States has provided notice of its intent to offer certain evidence under Rule 404(b) against Laney and Federico. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *Id*. This "is a rule of inclusion. Unless the evidence of other crimes tends only to prove propensity, it is admissible." *United States v. Rrapi*, 175 F.3d 742, 748 (9th Cir. 1999) (internal quotation marks and citation omitted).

Evidence of prior acts is admissible under Rule 404(b) if: (1) the evidence tends to prove a material element of the offense charged; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) in cases where knowledge and intent are at issue, the act is similar to the offense charged. *United States v. Ogles*, 406 F.3d 586, 592 (9th Cir. 2005). If the evidence meets this test under Rule 404(b), the court must then decide whether the probative value is substantially outweighed by the prejudicial impact under Rule 403. *United States v. Chea*, 231 F.3d 531, 534 (9th Cir. 2000).

As to Laney, the United States disclosed evidence that Laney admitted to the FBI that he has used other subcontractors to defraud Matrix on other projects. More specifically, in September 2011, Laney told FBI special agents about approaching another subcontractor, Robert Robles from CSC, with a plan to overbill Matrix with invoices for work that was never completed. In that scheme, Laney and CSC together overbilled Matrix with approximately 5 invoices for a total of $200,000 for work that was never completed. Laney used a nominee company called "Western State Consulting" along with Rogue to receive the CSC kickbacks. Bank records confirm the flow of money from CSC to Laney's bank

UNITED STATES' TRIAL MEM.
No. CR-12-00862 YGR          14

1  accounts.

2  As to Federico, the United States disclosed evidence that Federico deposited forged checks
3  written from his mother-in-law's (Rita Morris) home equity line of credit (HELOC) loan from U.S.
4  Bank.  Specifically, bank records establish that checks written on Morris' HELOC loan were deposited
5  with forged signatures into Federico's CEMS account at U.S. Bank—the same CEMS account Federico
6  used in charged conspiracy.

7  **VI. CONCLUSION**

8  The United States respectfully requests leave to file such supplemental memoranda as may be
9  necessary before or during trial in this case.

11  DATED: May 6, 2015                                    Respectfully submitted,

12                                                        MELINDA HAAG
                                                          United States Attorney
13
                                                          _____/s/_____
14                                                        BRIAN C. LEWIS
                                                          WADE M. RHYNE
15                                                        Assistant United States Attorneys